*Rubin v. O'Malley*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2023

Submitted: January 12, 2024     Decided: September 23, 2024

Docket No. 23-540-cv

_____

MICHELLE RUBIN,

*Plaintiff-Appellant,*

— v. —

MARTIN O'MALLEY,
COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*[*]

_____

---

[*] The Clerk of Court is respectfully directed to amend the caption to conform to the above. Kilolo Kijakazi, formerly Acting Commissioner of Social Security, was sued in her official capacity. By operation of Federal Rule of Appellate Procedure 43(c)(2), Martin O'Malley was automatically substituted upon assuming the office of Commissioner of Social Security on December 20, 2023. Although the notice of appeal spells Rubin's first name as "Michele," and that spelling appears at times in the record, the spelling "Michelle" is more common in the record, and is used in a treatment plan that Rubin herself signed, Admin. R. 592, and in a letter from her brother, *id.* at 289–91. We therefore adopt that spelling in this opinion.

B e f o r e :

KEARSE, LYNCH, and NARDINI, *Circuit Judges*.

———————

Plaintiff-Appellant Michelle Rubin filed a claim for Social Security Disability Insurance benefits in 2019 based on her medical condition of major depressive disorder. After a hearing, the administrative law judge denied Rubin's claim for benefits because she determined that Rubin was not disabled under the Social Security Act, 42 U.S.C. §§ 401–434. Rubin exhausted the administrative appeals process and then unsuccessfully challenged the final decision of the Social Security Administration in the United States District Court for the Southern District of New York. The district court affirmed the denial of benefits.

On appeal, Rubin argues that the agency's determination that she was not disabled during the period covered by her claim was not based on substantial evidence. We agree. Accordingly, we VACATE the district court's judgment, and REMAND with instructions to remand to the agency for further proceedings.

———————

Jeffrey Delott, Jericho, NY, *for Plaintiff-Appellant*.

Leslie A. Ramirez-Fisher, Benjamin H. Torrance, Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellee*.

———————

GERARD E. LYNCH, *Circuit Judge*:

In August 2019, Plaintiff-Appellant Michelle Rubin applied for Social

Security Disability Insurance benefits, based on her medical condition of major depressive disorder. After a hearing, an administrative law judge ("ALJ") determined that Rubin was not disabled under the Social Security Act, 42 U.S.C. §§ 401–434, and denied Rubin's claim for benefits. Rubin unsuccessfully challenged that decision through the agency appeals process.

Rubin now appeals from the February 15, 2023 judgment of the United States District Court for the Southern District of New York (Paul E. Davison, *M.J.*), denying Rubin's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and granting the cross-motion for judgment on the pleadings of the Acting Commissioner of Social Security (the "Commissioner"). For the reasons described below, the district court's judgment is VACATED, and the action is REMANDED with instructions to remand to the agency for further proceedings.

## BACKGROUND

### I.      Statutory and Regulatory Framework

The Social Security Administration (the "SSA") provides disability benefits, Social Security Disability Insurance and Supplemental Security Income, to applicants whom the Commissioner has determined to be eligible. *See generally*

3

42 U.S.C. §§ 401–434. To be eligible for those benefits, a claimant must be found, *inter alia*, to be disabled. A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner makes that determination through a sequential, five-step evaluation process. 20 C.F.R. § 404.1520(a)(4). If the Commissioner finds that the claimant is or is not disabled at any of these steps, the Commissioner makes the determination and does not proceed to the next step. *Id.*

At the first step, the Commissioner considers the claimant's work activity, if there is any, and determines whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to the second step and considers the medical severity of the claimant's impairment or combined impairments. *Id.* § 404.1520(a)(4)(ii). At step three, the Commissioner assesses whether the claimant's impairment or combined impairments meet or equal one of the listings in appendix 1 of Part 404, Subpart P (the "Listed Impairments"). *Id.*

§ 404.1520(a)(4)(iii). If the claimant has such an impairment or combination of impairments and satisfies the duration requirement, the Commissioner will find the claimant disabled. *See id.*; *see also id.* § 404.1509. If the Commissioner does not find the claimant disabled at step three, the Commissioner considers the claimant's residual functional capacity ("RFC")[1] and past relevant work to determine if the claimant can still perform her past relevant work. *Id.* § 404.1520(a)(4)(iv).

If the claimant cannot continue her past relevant work, at step five, the Commissioner considers whether she can nevertheless perform other work – taking into account the claimant's RFC, age, education, and work experience. *Id.* § 404.1520(a)(4)(v). While the claimant "bears the burden of proof in the first four steps of the sequential inquiry," *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013), "[i]n step five, the burden shifts, to a limited extent, to the Commissioner to show that other work exists in significant numbers in the national economy that the

---

[1] A claimant's RFC "is the most [the claimant] can still do despite [her] limitations" that "affect what [she] can do in a work setting." *Id.* § 404.1545(a)(1). The Commissioner makes this assessment based on all the relevant evidence in the record, including medical evidence and descriptions and observations of the claimant's limitations provided by the claimant or the claimant's family, friends, or others. *Id.* § 404.1545(a)(1), (3).

claimant can do," *Schillo v. Kijakazi*, 31 F.4th 64, 70 (2d Cir. 2022). If the claimant

cannot perform alternative work, the Commissioner will find that the claimant is

disabled. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For claims filed on or after March 27, 2017, as is the case here, the

Commissioner is required to apply 20 C.F.R. § 404.1520c in evaluating medical

opinion evidence in the record.[2] *See* Revisions to Rules Regarding the Evaluation

of Medical Evidence, 82 Fed. Reg. 5844, 5852–53 (Jan. 18, 2017). Pursuant to that

regulation, the Commissioner considers the persuasiveness of each medical

opinion using the factors listed in § 404.1520c(c)(1)–(5). *See* 20 C.F.R.

§ 404.1520c(a). Of those factors, supportability and consistency are the most

important, and the Commissioner must therefore explain how he considered

supportability and consistency as applied to each medical source's opinion in his

determination or decision. *See id.* § 404.1520c(a), (b)(2). But the Commissioner

---

[2] As relevant here, "[m]edical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), . . . what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *See id.* § 404.1527(a)(1). While § 404.1520c created new "rules" for "*[h]ow [the SSA] consider[s] medical opinions*" with respect to claims filed on or after March 27, 2017, the description of what constitutes a "medical opinion" is not a rule; nor does § 404.1520c, in describing its new process for evaluating "medical opinions" provide any new description of what constitutes a "medical opinion."

"will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's] medical sources." *Id.* § 404.1520c(a).[3]

## II. Administrative Proceedings

Rubin's background is detailed in the administrative record. Rubin was born in January 1967 and graduated from college in 1988. She began working in 1983, when she was 16 years old. She has worked as a retail buyer, and most recently, as a retail salesperson. The record indicates that her alleged onset date in February 2018 was also her last day of work as a retail salesperson, "due to [her] condition." Admin R. 262. She also intermittently made and sold clothing online and at "trunk shows," which involved bringing inventory she had not

---

[3] Until March 27, 2017, the regulations required the ALJ to give "controlling weight" to the opinion of the applicant's treating physician, subject to certain qualifications and exceptions. *See id.* § 404.1527(c)(2). But that rule has been revoked, and for applications (such as Rubin's) filed on or after March 27, 2017, the treating physician's opinion is no longer given special deference, and the medical evidence is to be weighted according to the criteria discussed above. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5852–53 (Jan. 18, 2017) (explaining the SSA's changes to the medical evidence rules).

been able to sell online to a store in Florida, owned by someone else; that enterprise had ceased completely by April 2019.[4]

On August 5, 2019, Rubin applied for Social Security Disability Insurance benefits, alleging a disability onset date in February 2018[5] and a date last insured of December 31, 2019. Her application was completed after Rubin spoke with the SSA on September 20, 2019. The SSA denied her application initially and on reconsideration. Rubin requested a hearing before an ALJ, which was held on January 14, 2021. Rubin and a vocational expert testified at the hearing.

---

[4] The fact of the closure of Rubin's business comes from a 2019 treatment plan from the Karen Horney Clinic, where Rubin received treatment for her depression. That plan states that "[Rubin] has closed her business since last quarter," Admin. R. 785, but does not specify when this statement was made (and thus to which quarter it refers). The version of the plan that appears in the administrative record was signed in October 2019, but includes certain goals that were identified in April 2019. It is not clear to us that the precise date when Rubin's business closed is material, and so we proceed on the basis of the ALJ's and the parties' reading of the record, that it occurred by April. *See* Admin. R. 83 (citing Rubin's "April 1, 2019, treatment plan"); Appellee's Br. 11 (citing Admin. R. 785).

[5] The record includes references to an alleged disability onset date of both February 5, 2018 and February 28, 2018. This discrepancy is immaterial because a claimant is "entitled to disability benefits beginning with the first month covered by [the claimant's] application in which [she] meet[s] all the other requirements for entitlement." 20 C.F.R. § 404.316(a).

### A. The Evidence Before the ALJ

#### 1. Rubin's Testimony

At the hearing before the ALJ, Rubin testified regarding the effects of her condition during the approximately two-year period from her alleged disability onset date to her date last insured. Rubin described her overall mental health as "not good." Admin. R. 24. Despite consistently taking her prescribed psychotropic medications, she was prone to panic attacks and "meltdowns." *Id.* at 23, 29. Rubin's panic attacks, usually brought on by serious triggers like a death in the family, resulted in difficulty breathing and heart attack-like symptoms. Rubin characterized her "meltdowns," which could be triggered by anything (such as receiving mail addressed to one of her deceased parents), as periods, sometimes lasting hours, during which she would cry uncontrollably. *Id.* at 29–30.

When asked to explain why she is unable to work on a full-time basis, Rubin stated that she spends much of the day crying; her panic attacks are unforeseeable; her sleep schedule is inconsistent, causing her to sleep during much of the day; she is unable to learn anything new; and she can no longer interact with customers, which she cited as the reason that she was fired from her

last job. She stated that "new places, things . . . anything new that's . . . out of [her] norm" causes her stress. *Id.* at 29. In the past, she attempted to take an online class but was overwhelmed by tasks and deadlines.

Rubin further testified about how her condition has affected her day-to-day life. She explained that she sometimes does not leave her house for weeks at a time, and does so for the most part only to attend medical appointments. She has been a patient at the Karen Horney Clinic, under the care of psychiatrist and clinic executive director Dr. Henry Paul and several therapists, since 2014, including throughout the period at issue and continuing through the date of the hearing. Because the clinic is near her residence, she is able to walk to her appointments. She stated that most activities of daily living overwhelm her, so she relies on others to deliver food to her or she orders food to her house; she does not make the bed; she sends her laundry out; and she often goes days without showering. She relies on a system of post-its to remind her to take her medications and pay her bills. She does not attend holiday events or birthdays, and she struggles to concentrate long enough to even watch the news for more than ten or fifteen minutes.

## 2. Non-Medical Evidence

Two letters submitted on Rubin's behalf, one from her brother and one from a friend of thirty-five years, provide a narrative consistent with Rubin's testimony. Rubin's brother and friend each described Rubin as having had a relatively normal and successful life before the age of thirty. But six days after Rubin's thirtieth birthday, her father committed suicide. His death seemed to change the trajectory of Rubin's life. She became depressed, anxious, and irritable. Her personal relationships fell apart or became strained. Rubin's friend noted that she had been fired from past jobs because of her mental state.

Rubin's brother described their mother's death on March 12, 2019 as another critical point in Rubin's life. It was ultimately Rubin's decision to withdraw care after their mother had been placed on a ventilator, an event that her brother described as "horribly traumatizing for her." Admin. R. 290. At that time, Rubin was reportedly detained by the hospital medical staff because they feared she might be suicidal. After their mother's funeral, Rubin's brother (who at that time lived abroad) tasked her with calling a company to arrange for their mother's house to be cleaned out. He considered this an easy task, as friends had provided them with several recommendations for firms that could do the work.

11

Rubin decided instead to clean the house herself and hold an estate sale. But three months later, her brother returned to the United States and found that Rubin had done almost nothing on the project and that her condition had deteriorated further. She had become prone to outbursts and would cry whenever friends or neighbors expressed any disagreement with her.

After returning to his home abroad, Rubin's brother contacted her frequently to monitor her condition. He observed that she was spending most of her time alone in her apartment. She was suffering from insomnia, evidenced by her texts to him throughout normal sleeping hours. She expressed feelings of hopelessness and worthlessness in nearly every communication she had with him. In September 2019, Rubin's brother began seeking an inpatient psychiatric care facility for Rubin. She was receptive to that idea, but they could not find an affordable facility. Rubin's friend described Rubin as living like a "recluse," and confirmed that she cries constantly and is unable to complete even ordinary household tasks. *Id.* at 288.

### 3. Medical Evidence

The medical evidence of record includes treatment notes and medical records from the Karen Horney Clinic documenting Rubin's visits with several

therapists and Dr. Paul from 2014 until 2021, the medical opinions of Dr. Paul, and the findings of two state agency psychologists, O. Fassler, Ph.D., and M. Juriga, Ph.D.

The treatment notes produced by Rubin's therapists provide an indication of the severity of Rubin's major depressive disorder throughout the alleged period of disability. Throughout that period, Rubin attended individual therapy sessions at the clinic approximately every week, first with Danielle Kowalski, Licensed Master Social Worker, and later with Megan Larigan, Mental Health Counselor. The therapy treatment notes consistently describe Rubin as depressed, but oriented to time, place, and persons, and with no obsessions, compulsions, hallucinations, or delusions. From the start of the relevant period, Rubin frequently reported difficulty eating, sleeping, and engaging in other activities of daily living. While Rubin often appeared adequately groomed at her therapy appointments, she also frequently appeared disheveled, unkempt, or malodorous. Rubin often presented as irritable in therapy, and in November 2018, she became irritable and defensive when speaking with Kowalski about a billing issue. The notes explicitly describe that Rubin had difficulty asking others for help and document Rubin's distress about her relationships and

disagreements with romantic partners, her family members, coworkers, and others. While Rubin was no longer working as a retail salesperson during the relevant period, the notes describe her efforts to build a custom clothing business, including taking several trips to Florida in 2018. However, they also reflect that Rubin expressed feeling overwhelmed by increased demand for her merchandise and anxiety about losing customers. By April 2019, Rubin had closed her business, reportedly because she could not financially sustain her work. In August and September 2019, Rubin discussed the possibility of 24-hour support and crisis respite options with her therapists. The therapy notes from June to October 2019 reflect that Rubin was frequently tearful or crying intermittently or throughout the therapy sessions.

During the same period, Dr. Paul prescribed and managed Rubin's medications and conducted mental status examinations ("MSEs"). Dr. Paul treated Rubin in March and June 2018, as well as approximately each month from January to November 2019. Throughout the relevant period, the results of the MSEs conducted by Dr. Paul were largely normal. Rubin was cooperative, well-related, had good eye contact, was mood-congruent, demonstrated attention and

14

concentration within normal limits, and her memory was intact. At the end of the relevant period, Dr. Paul noted that Rubin continued to report issues with sleep.

On January 17, 2020, Dr. Paul completed a Mental Medical Findings Summary ("MMFS") questionnaire in connection with her application for disability benefits. Dr. Paul indicated on the MMFS that Rubin's treatment at the clinic began in 2014, that her most recent exam with him was in October 2019, and that her most recent session with her therapist was in January 2020. His diagnosis was "Major Depressive Disorder, [r]ecurrent episode, [s]evere" and he opined that this condition prevented Rubin from being able to perform full time work. Admin. R. 880. He also identified the following objective clinical findings: sleep disturbance, diminished interest in almost all activities, feelings of guilt/worthlessness, appetite disturbance with change in weight, difficulty thinking or concentrating, decreased energy, depressed mood, restlessness, irritability, distractibility, and easily fatigued. In explaining why the objective medical evidence supports his opinion regarding Rubin's functional limitations, Dr. Paul stated that Rubin's "significant grief," "sleep difficulties," "distractability," concentration issues, and "compromised ability to engage consistently in activities of daily living . . . impede [Rubin's] ability to work full-

time." *Id.* at 881. In explaining why the subjective evidence supports his opinion regarding Rubin's functional limitations, Dr. Paul wrote that the objective medical evidence "contributes to mood dysregulation which further impedes [Rubin's] ability to work full-time." *Id.* In his opinion, Rubin would be off task more than 20% of the time due to her medical condition and treatment.

In the MMFS, Dr. Paul also opined on the criteria relevant to a determination of whether a claimant meets paragraph B or C of Listed Impairment 12.04: depressive, bipolar, and related disorders.[6] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, 12.04. In evaluating whether Rubin meets the

---

[6] To meet Listed Impairment 12.04, a claimant must establish the criteria of paragraph A and of B or C. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, 12.04. Here, it is undisputed that Rubin meets the paragraph A criterion – she has provided medical documentation of a depressive disorder. Paragraph B requires an extreme limitation in one, or a marked limitation in two, of the four specified areas of mental functioning that a person uses in a work setting: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* Pt. 404, Subpt. P, App. 1, Pt. A, 12.04(B). The paragraph C criteria, an alternative to the paragraph B criteria, require that the claimant's disorder is "'serious and persistent'" in that there is a "medically documented history of the existence of the disorder over a period of at least 2 years" and evidence of (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the symptoms and signs of the claimant's disorder, and (2) the claimant's "[m]arginal adjustment," or "minimal capacity to adapt to changes in [the claimant's] environment or to demands that are not already part of [the claimant's] daily life." *Id.* Pt. 404, Subpt. P, App. 1, Pt. A, 12.04(C).

paragraph B criteria, Dr. Paul opined that Rubin has marked limitations in two areas of functioning: (1) ability to concentrate, persist, or maintain pace and (2) ability to adapt or manage oneself. As to the paragraph C criteria, he confirmed that Rubin has at least a two-year medically documented history of her disorder with both (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes the signs and symptoms of the disorder and (2) marginal adjustment. Then, in a May 2020 letter to Rubin's attorney, Dr. Paul reasserted, in narrative form, his medical opinion that Rubin meets both the paragraph B and C criteria based on Rubin's entire medical history at the clinic. He identified marked limitations in the same two paragraph B areas of mental functioning, and explicitly stated that "Rubin has been receiving mental health therapy and psychiatric services at [the] Karen Horney Clinic since June 2014 and demonstrates minimal capacity to adapt to demands that are not already part of her daily life," such that she satisfies the paragraph C criteria. Admin. R. 886.

The two state agency consultants who examined the record, Drs. Fassler, and Juriga, opined that there was insufficient evidence in Rubin's file to

adjudicate her claim.[7] In particular, they found that there was insufficient evidence as to the paragraph B and C criteria of Listed Impairment 12.04. Neither, however, opined that she did *not* meet those criteria.

### B.     The ALJ's Decision

The ALJ issued her decision on May 26, 2021, concluding that Rubin was not disabled under sections 216(i) and 223(d) of the Social Security Act during the relevant period and therefore was not entitled to benefits. Applying the five-step framework, the ALJ found that Rubin had met the first two steps – she had not engaged in substantial gainful activity between her alleged onset date and her date last insured and had a severe impairment, major depressive disorder, during that period.

However, at step three, the ALJ determined that Rubin did not have an impairment that met or medically equaled one of the Listed Impairments. In making this determination, the ALJ considered the paragraph B criteria and concluded that Rubin did not have marked or extreme limitations in any of the four broad areas of functioning identified by the SSA as used in a workplace.

---

[7] The state agency psychologists noted that Rubin had not attended a consultative examination. Rubin contends that neither she nor her attorney received notice of a requested examination.

Specifically, with regard to concentrating, persisting, or maintaining pace, the ALJ found that Rubin had a mild limitation. The ALJ acknowledged Rubin's testimony regarding her difficulty with change, learning new things, meeting deadlines, and staying on task for even twenty minutes, but cited the following in support of her determination: Rubin can pay bills, count change, and handle a savings account; she can handle a business selling handmade clothing; she is college educated; she lives alone, can shop by phone and computer, and is able to maintain her household; and she attends therapy, is able to stay on task during her therapy sessions, and is compliant with her medication. The ALJ also noted that Rubin's treatment notes indicated that she had coherent thought processes and did not exhibit hallucinations, delusions, or paranoia. As for adapting and managing oneself, the ALJ found a moderate limitation, citing the following as evidence: Rubin generally presented as adequately groomed at her treatment sessions at the Karen Horney Clinic, though her appearance was also sometimes disheveled, unkempt, or malodorous; she is college educated; she is able to handle a business selling handmade clothing and her own finances; she lives alone, can shop by phone and computer, and is able to maintain her household;

she is able to ask for help when needed; and she goes to therapy regularly and is compliant with medication.

Considering the paragraph C criteria, the ALJ stated that "there is no evidence, as detailed below, of a minimal capacity to adapt to changes in the environment or to demands that are not already part of claimant's daily life." Admin. R. 80. But the ALJ did not provide any additional discussion or support for that determination in the remainder of the step three analysis.

Having determined that Rubin did not meet the requirements of a Listed Impairment, the ALJ then determined that Rubin had the RFC to perform a full range of work, subject to several nonexertional limitations. Rubin could work in a low stress job, with only occasional changes in the work setting, no assembly line work, and no strictly enforced daily production quotas. Further, she could have only occasional interaction with the public, coworkers, and supervisors. The ALJ claimed to have considered the entire record, including Dr. Paul's medical opinions and the prior administrative medical findings in assessing Rubin's RFC.[8] The ALJ found both of the opinions of the agency consultants to be

---

[8] At the initial and reconsideration levels of the administrative review process, agency medical or psychological consultants make "administrative findings about the medical issues, including, but not limited to, the existence and severity

partially persuasive – while she found that the evidence showed that Rubin failed to comply with agency efforts to obtain information, the ALJ concluded that there was sufficient evidence in the file to support that Rubin had a severe mental impairment. The ALJ also found Dr. Paul's opinions to be partially persuasive. In explaining her reasoning, she stated that the evidence in the record "does not support marked or extreme limitations in any of the paragraph B criteria" of Listed Impairment 12.04 and that Dr. Paul's opinions "conflict with [the MSE that he] performed on December 30, 2020, where he noted" largely normal results. Admin. R. 84–85. The ALJ did not address how the evidence comports with Dr. Paul's assessment of the paragraph C criteria. *Id.*

---

of [the claimant's] impairment(s), the existence and severity of [the claimant's] symptoms, whether [the claimant's] impairment(s) meets or medically equals the requirements for any impairment listed in appendix 1 to [subpart P], and [the claimant's] residual functional capacity." 20 C.F.R. § 404.1513a(a)(1). Such administrative medical findings "are not in themselves evidence at the level of the administrative review process at which they are made" but must be considered, though not necessarily adopted, later in the administrative review process by the ALJ. *Id.* § 404.1513a(a)(1), (b)(1). Here, the prior administrative medical findings consist of the findings made by the agency psychologists, Drs. Fassler and Juriga, at the initial and reconsideration levels of the process, respectively. Drs. Fassler and Juriga each made administrative findings that there was insufficient evidence in the record as to paragraphs B and C of Listed Impairment 12.04.

At the fourth step of the analysis, the ALJ accepted the vocational expert's testimony and determined that Rubin could not perform her past relevant work with her assessed RFC. Finally, at the fifth step, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Rubin could perform including office helper, dining room attendant, and mail sorter.

## C. Review of the ALJ's Decision

Rubin requested administrative review of the ALJ's decision. The SSA's Appeals Council denied Rubin's request for review, making the ALJ's decision the final decision of the Commissioner.

On June 6, 2022, Rubin commenced this action in the United States District Court for the Southern District of New York. The district court denied Rubin's motion for judgment on the pleadings, which sought reversal of the Commissioner's decision that she was not disabled under the Social Security Act, and granted the Commissioner's cross-motion for judgment on the pleadings, affirming the denial of Rubin's claim for benefits.

## DISCUSSION

### I. Standard of Review

Under 42 U.S.C. § 405(g), federal courts are permitted to engage in only "limited review of final SSA disability benefit decisions." *Schillo*, 31 F.4th at 74. "On an appeal from the denial of disability benefits, we focus on the administrative ruling rather than the district court's opinion . . . because the same standard of review applies to the agency's decision, both in the district court and before a court of appeals." *Id.* (internal quotation marks and citation omitted). "'We conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019), quoting *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam). In determining whether there is evidentiary sufficiency under this standard, we are "required to examine . . . contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (internal quotation marks omitted). "'If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.'" *Schillo*, 31 F.4th at 74, quoting *McIntyre v. Colvin*,

758 F.3d 146, 149 (2d Cir. 2014). But this principle presupposes that the ALJ has not disregarded or misconstrued relevant evidence and has not applied incorrect legal standards.

## II. The ALJ's decision was not supported by substantial evidence.

Rubin argues that the ALJ committed a categorical error by denying her application for benefits without a medical opinion to support that decision. As Rubin points out, the record in the present case includes the substantive medical opinions of only one physician, Dr. Paul. In multiple assessments and formal statements referencing Rubin's lengthy history of treatment at the Karen Horney Clinic, Dr. Paul opined that Rubin met the criteria of Listed Impairment 12.04 and did not have the capacity to perform even low stress work on a consistent basis. While two state agency psychologists also examined the record at the initial and reconsideration levels of the administrative process, they each opined that there was insufficient evidence to adjudicate Rubin's claim. Because the record therefore does not contain any medical opinion concluding that Rubin was not disabled, Rubin argues that the ALJ's decision, including both the ALJ's determination that Rubin did not meet the requirements of Listed Impairment

24

12.04 and the assessment of Rubin's RFC, is not, and categorically could not be, supported by substantial evidence.

The ALJ's error was not categorical. An ALJ's decision must be supported by substantial evidence – but there is no blanket requirement that such a decision must be supported by a congruous medical opinion for it to meet that evidentiary standard. As discussed, 20 C.F.R. § 404.1520c provides the framework for how the Commissioner considers medical opinions in an administrative record when evaluating disability for claims filed on or after March 27, 2017. The explicit language of that regulation requires that an ALJ consider and articulate "how persuasive [the SSA] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b). The regulation further provides that when "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported . . . and consistent with the record," the ALJ must articulate how she considered other factors, including the source's relationship with the claimant or level of specialization, as to each medical opinion or administrative finding. *Id.* § 404.1520c(b)(3), (c). Nothing in the regulation

25

indicates that an ALJ's ultimate determination of disability or assessment of RFC must comport with a specific medical opinion.[9]

---

[9] Rubin asks us to find such a requirement by relying on precedent decided pursuant to the regulation governing claims filed before March 27, 2017. In *Balsamo v. Chater*, the primary Second Circuit case that Rubin identifies, we concluded that the ALJ's determination that the claimant had the RFC to perform the full range of sedentary work was not supported by substantial evidence because "the Commissioner . . . failed to introduce *any medical evidence* that [the claimant] could hold a sedentary job." 142 F.3d 75, 80 (2d Cir. 1998) (emphasis added). We went on to discuss the ALJ's analysis under 20 C.F.R. § 404.1527 of the medical opinion evidence in that record, *see id.* at 80–81, which Rubin unconvincingly points to as support for her argument that an ALJ's decision regarding a claim filed *after* March 27, 2017 must be directly supported by a medical opinion. That case is inapposite because the present case rests on the evaluation of opinion evidence under the new regulation. Still, we note that the determination of whether substantial evidence exists to support an ALJ's decision rendered under either regulation is an inquiry that, by its nature, turns on the particular facts of a case. This Court has found that evidentiary burden to be met under various circumstances. *See, e.g., Schillo*, 31 F.4th at 78 (holding that the ALJ's ultimate RFC determination was supported by substantial evidence where the ALJ accorded the medical opinions in the record some weight and considered MRI and x-ray results, as well as notes documenting the claimant's visits with other medical providers); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8–9 (2d Cir. 2017) (holding that the ALJ's RFC determination was supported by substantial evidence where the ALJ relied on a physician's treatment notes that provided "contemporaneous medical assessments"); *Solis v. Berryhill*, 692 F. App'x 46, 48–49 (2d Cir. 2017) (holding that the ALJ's determination that a claimant did not meet the criteria of a Listed Impairment was supported by substantial evidence, which included the claimant's own statements and reports of his daily activities and work activity).

Although the fact that the record does not include a medical opinion concluding that Rubin can perform substantial gainful work is not dispositive, it is also not insignificant. In the absence of a medical opinion contradicting Dr. Paul's opinion that Rubin meets the listed criteria, we must carefully scrutinize the rest of the record evidence to determine whether it supports the ALJ's decision to partially discount Dr. Paul's opinion and conclude that Rubin did not meet those criteria. Here, the ALJ erred because she misinterpreted the medical and lay evidence, failing to appreciate the consistent narrative that it provides that supports Dr. Paul's opinion that Rubin met the requirements of Listed Impairment 12.04, and therefore was, during much of the relevant period, disabled.

We focus our discussion on step three of the sequential analysis. At step three, the ALJ determined that Rubin did not meet the requirements of paragraph C of Listed Impairment 12.04. Addressing whether the paragraph C criteria were satisfied, the ALJ summarily stated: "there is no evidence, as detailed below, of a minimal capacity to adapt to changes in the environment or to demands that are not already part of claimant's daily life." Admin R. 80. In doing so, the ALJ acknowledged only one of the two necessary paragraph C

criteria, the (C)(2) criterion, and offered no specific support for her conclusion that Rubin did not have a "[m]arginal adjustment" as required by paragraph (C)(2). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, 12.04(C)(2). That alone does not end our inquiry. We have held that "the absence of an express rationale does not prevent us from upholding the ALJ's determination regarding [an] appellant's claimed listed impairment[] [where] portions of the ALJ's decision and the evidence before [her] indicate that [her] conclusion was supported by substantial evidence." *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982). But the other portions of the ALJ's decision and the record evidence here do not provide substantial support for the ALJ's conclusion that Rubin could adapt to changes in her environment or demands not already part of her daily life.

In the other portions of her decision, the ALJ highlighted that the record evidence showed that Rubin is college educated, lives alone, is compliant with her medications and goes to therapy regularly, and is "able to handle a business selling handmade clothing" and "to maintain her household." Admin. R. 79. Without context, those facts might appear to support the ALJ's paragraph C determination and undercut Dr. Paul's contrary assertion that Rubin could not

28

adapt to changes in her environment and new demands. Our review of the record indicates otherwise.

As noted above, the record includes hundreds of pages of notes from Rubin's sessions with her therapists and Dr. Paul throughout the period that Rubin claims she was disabled and entitled to benefits. From the beginning of the relevant period, the therapy notes indicate that Rubin struggled to complete activities of daily living. In February and March 2018, Rubin's then-therapist Kowalski consistently reported that Rubin had difficulty functioning, including eating and sleeping. Dr. Paul also assessed Rubin in March 2018, noting that she reported feeling depressed and would be trying a new anti-psychotic medication. Notably, the results of the MSE conducted by Dr. Paul at that appointment were largely normal. Rubin had presented as adequately groomed, cooperative, euthymic, and well-related, with normal speech, thought processes, and concentration.

The ALJ highlighted Dr. Paul's frequent use of language of this sort as a reason for partially discrediting his overall opinion, suggesting that the opinion was not supported by his treatment notes. But the ALJ appears to have misconstrued both Dr. Paul's role in Rubin's care and the evidence that was

29

available to him as a basis for the opinion he expressed. The therapy notes and other documentation from the Karen Horney Clinic, taken as a whole, clarify Dr. Paul's role and his ability to analyze her mental state and level of functioning. The record of her treatment at the clinic fully supports his opinion.

Dr. Paul, as Rubin's psychiatrist, was primarily responsible for her medication management. He examined Rubin less frequently than her therapists, and his treatment notes often took the form of a short note expressing Rubin's "chief complaint," followed by any changes in her medication and sometimes the results of a rudimentary MSE. For example, on October 10, 2019, Dr. Paul simply wrote that Rubin was "depressed and somewhat immobilized" and noted an addition to Rubin's medication regimen. Admin R. 1550. But the records indicate that Dr. Paul and Rubin's therapists were working as a team to oversee her care. The therapists at times recommended that Rubin work with Dr. Paul to address concerns aired at therapy, like her sleep issues. Dr. Paul also signed off on the treatment plan that Rubin created with Kowalski near the beginning of the relevant period, indicating that he was part of the team that would assist Rubin in working toward the goals set out in that plan. Finally, Dr. Paul clearly drew upon Rubin's entire medical record at the clinic when making his formal medical

statements. When asked to identify Rubin's last examination on the MMFS, Dr. Paul wrote both Rubin's most recent examination with him and her most recent examination with a therapist at the clinic. Dr. Paul also explicitly mentioned Rubin's years-long history at the clinic in writing his first letter about her status and functionality. Thus, while Dr. Paul's own notes do not provide extensive descriptions of Rubin's state throughout the relevant period, they are not inconsistent with the more detailed therapy treatment notes or with Dr. Paul's own formal medical opinions. It is clear that, as Rubin's psychiatrist, a member of her care team at the clinic, and the director of that clinic, he relied on the treatment records from all medical providers at the clinic in preparing his formal medical opinions and statements.

Those notes show a fuller, and much more troubling, picture of Rubin's condition than Dr. Paul's own somewhat anodyne account of his shorter and less frequent interactions with Rubin. In April 2018, Kowalski conducted a formal assessment of Rubin. On that assessment, Rubin indicated that she felt tired and had trouble concentrating nearly every day and that she experienced poor appetite or overeating more than half of the days over the prior two weeks. She had also, at times over the prior three months, wished that she were dead or that

31

she would fall asleep and not wake up. During roughly the same period, the notes confirm that Rubin was operating her clothing business, including conducting some travel to Florida to sell her custom pieces out of another person's store. The ALJ cited that business as a reason to conclude that Rubin had a greater functional capacity than Dr. Paul opined that she had. But the ALJ largely ignored the treatment notes that provided context for her experience with that business, noting in her decision few examples of when Rubin reported feeling stress as a result of work.

In fact, Rubin repeatedly reported that work-related stress and family conflict exacerbated her functional difficulties. In April 2018, Rubin created a treatment plan with Kowalski, which was also signed by Dr. Paul. The treatment plan listed several of Rubin's identified issues, including problems "related to social environment" and occupational and economic problems. Admin. R. 503. It also noted that "[o]ngoing [m]onitoring . . . [i]ndicates severe depression that would require psychiatric[, that is, medical,] management." *Id.*

At the end of April 2018, Rubin appeared disheveled at therapy, and requested a second weekly session in early May. Throughout May 2018, the therapy notes indicate that Rubin reported feeling overwhelmed by the work she

was doing and continued to present as disheveled at therapy. When her business increased, she found it difficult to feel positively about that increase "when she [was] struggling to function at home" and having "difficulty finding time to sleep and eat regularly." *Id.* at 477. She also reported that she was unable to manage activities of daily living and her work when her mother had cataract surgery that month and needed help from Rubin – a short-term change from Rubin's routine. Although by the end of May 2018 Rubin was beginning to feel some optimism about her upcoming work trip, when she returned to therapy after the trip in June, she reported continued anxiety about completing work.

Dr. Paul assessed Rubin in June 2018, again recording largely normal MSE results and making some notes about Rubin's medications. At about the same time, however the treatment plan prepared by Kowalski in July 2018 stated that Rubin "remain[ed] unable to maintain routines and consistency in [activities of daily living]." *Id.* at 448.

Throughout the rest of 2018, Rubin continued to sell custom clothing, but the business was not going well, as she also continued to report stress related to that work and her finances. In December 2018, Rubin reported to her therapist that she would need to close her business in the new year. An April 2019

treatment plan confirmed that Rubin had closed her business "since last quarter," *id.* at 1563, and none of the 2019 treatment notes reference any work activity. In short, the treatment records as a whole demonstrate that, far from being able to conduct a successful business, Rubin – despite diligent efforts to remain productively employed – was *unable* to handle the stress of managing a business, and had to abandon it by April 2019.[10]

In early 2019, Rubin's mother passed away. Rubin's brother explained in his letter that the death was a traumatizing event in Rubin's life and resulted in her being detained by the hospital staff treating her mother. The therapy notes

---

[10] Indeed, the ALJ herself found that Rubin had not "engage[d] in substantial gainful activity" after losing her part-time retail job in February 2018, Admin. R. 78, implicitly recognizing that her venture into self-employment was insubstantial. The record is inconsistent with the ALJ's conclusion that she was "able to handle a business selling handmade clothing." *Id.* at 79–80; *see also id.* at 83. Similarly, the ALJ's cherry-picked citation of Kowalski's treatment notes pointing to optimistic predictions about her business, *id.* at 79–80, refers to events in June 2018; that selection ignores the context of the steady downward trajectory in Rubin's condition generally and in her business specifically. The predicted expansion of the business was chimerical, and she abandoned it entirely by April 2019; her personal situation similarly deteriorated to the point where in-patient psychiatric care was considered by both her therapist and her brother, and did not eventuate because she could not afford such care. To the extent that the ALJ's cited evidence might suggest that Rubin was not disabled during some of 2018, it certainly does not support a finding that she was not seriously impaired well within her coverage period.

from March 2019 confirm that; Kowalski noted the death and reported that she spoke with Rubin about "vague [suicidal ideation] comments made while [Rubin was] in [the] hospital with [her] mother." Admin. R. 1643. In April 2019, Rubin reported feeling fearful, isolated, and concerned about her "financial and emotional future" and frustrated with friends. *Id.* at 1639. She cried throughout one of her sessions that month and repeatedly reported difficulty engaging in activities of daily living and inability to sleep.

The therapy notes indicate that in June 2019, Rubin and Kowalski had discussed increasing the level of care Rubin was receiving. For the remainder of the relevant period, Rubin frequently cried for parts of or throughout her therapy sessions. In August, the therapy notes describe that Rubin had, in the past week, "sat in her car with the garage closed and considered turning the engine on." Admin. R. 1594. Though Rubin did not report any other incidences of specific suicidal ideation through the rest of the relevant period, she did at times describe a general wish that she would fall asleep and not wake up. At the end of August, Kowalski informed Rubin that she would be leaving the clinic, and therefore would need to transfer Rubin to the care of another therapist at the clinic, Larigan. According to the notes, Rubin was distressed by this change. In a

transfer form, Kowalski noted that Rubin reported "being in crisis and feeling unsafe due to lack of social support." *Id.* at 1569.

The treatment notes from August to September 2019 reflect that Rubin had started to *repeatedly* inquire about a higher level of care. Both Kowalski and Larigan discussed the possibility of in-patient treatment at a "crisis respite" facility with Rubin. The therapy notes indicate that Rubin ultimately decided not to go to such a facility; the letter provided by her brother offered the explanation that it was not financially feasible for Rubin to do so. The therapy notes also show that Larigan discussed the possibility of increasing Rubin's therapy sessions to twice a week, and that Rubin did attend two sessions a week at times throughout the remainder of the relevant period. Finally, the therapy notes during this period note that Rubin continued to struggle with activities of daily living and sleep.

The non-medical evidence in the record, specifically, Rubin's own testimony and the letters submitted by her brother and friend, provides an even more vivid description of Rubin's day-to-day life that closely tracks the treatment

notes and comports with Dr. Paul's opinions.[11] Far from showing that Rubin was "able to handle a business" and "maintain her household," that evidence demonstrates that Rubin was consistently having difficulty with basic daily activities, that her condition was exacerbated around the time of the death of her mother and continued to deteriorate throughout the remainder of the relevant period, and that *any* change in her environment and routine caused distress, anxiety, and fear. Rubin reported that she was unable to make her own meals and rarely left the house; her brother and friend corroborated that she could not do even "ordinary chores," *id.* at 288, and that she largely refused to venture outside of her apartment "even just to go for walks to get outside," despite her brother begging her to do so, *id.* at 291. Taken together, the records from the Karen Horney Clinic and the non-medical evidence do not constitute substantial evidence to support the ALJ's determination that Rubin failed to demonstrate "[m]arginal adjustment" or "minimal capacity to adapt to changes in [her] environment or to demands that are not already part of [her] daily life." *See* 20

---

[11] The ALJ cursorily addressed the letters submitted by Rubin's brother and friend, stating that they "describe activities that are consistent with [Rubin's] reported activities/allegations/testimony," but that the "medical record does not document or support the degree of limitation described." Admin. R. 85.

C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, 12.04(C)(2). Instead, the evidentiary record aligns with Dr. Paul's assessment that Rubin met the paragraph C(2) criterion.

Finally, before turning to her evaluation of Rubin's RFC, the ALJ did not address, even in a sentence, the other paragraph C criterion, namely whether there is evidence of medical treatment, mental health therapy, psychosocial support, or a highly structured setting that is ongoing and that diminishes Rubin's symptoms and signs of her disorder. *See id.* Pt. 404, Subpt. P, App. 1, Pt. A, 12.04(C)(1). Again, we are permitted to uphold an ALJ's determination regarding a Listed Impairment even where the ALJ does not provide her rationale for this determination, if it is supported by other parts of the ALJ's decision and the record. *See Berry*, 675 F.2d at 468. But here the other parts of the ALJ's decision and the evidence in the record indicate that Rubin satisfied the C(1) criterion. In making a finding as to Rubin's RFC, the ALJ referenced Rubin's lengthy history of psychiatric treatment at the Karen Horney Clinic, including weekly psychotherapeutic treatment during the relevant period. The ALJ also noted that Rubin is prescribed several psychotropic medications. Thus, substantial evidence does not support a determination that Rubin did not satisfy the requirements of paragraph C of Listed Impairment 12.04.

**CONCLUSION**

For the foregoing reasons, we hold that the ALJ's determination that Rubin did not meet the 12.04 listing criteria is not supported by substantial evidence. The ALJ therefore erred in finding that Rubin failed to establish that she was disabled under the Social Security Act and entitled to benefits at step three of the sequential analysis. We are reluctant, however, to determine that Rubin was in fact disabled, given that the absence of additional medical evidence stems from her failure to appear for a consultative examination. Even assuming that that failure was not willful, and resulted from a communications breakdown, we conclude that the better course is to remand the case to the agency for further proceedings, including a fuller consideration of the existing evidence and the results of a consultative examination. Accordingly, the judgment of the district court is VACATED, and the case is REMANDED to the court with instructions to remand the case to the Commissioner for further proceedings not inconsistent with this opinion.