*Nunez v. Commissioner of Social Security*

# In the
# United States Court of Appeals
# For the Second Circuit

_____

August Term, 2023
Argued: March 19, 2024
Decided: November 25, 2025

Docket No. 23-831-cv

_____

GOVANNI R. NUNEZ,

*Plaintiff-Appellant,*

*v.*

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee.*[*]

_____

Appeal from the United States District Court
for the Southern District of New York

_____

Before:      CARNEY, SULLIVAN, and LEE, *Circuit Judges.*

Plaintiff-Appellant Govanni R. Nunez appeals from a judgment entered in the United States District Court for the Southern District of New York (Valerie Figueredo, *Magistrate Judge*), granting a motion for judgment on the pleadings in favor of Defendant-Appellee Commissioner of Social Security (the

_____

[*] The Clerk of Court is respectfully directed to amend the case caption as set forth above.

"Commissioner"). Upon review, we hold that the Administrative Law Judge ("ALJ") did not support her opinion regarding Nunez's residual functional capacity ("RFC") with substantial evidence.

During the administrative hearing, the vocational expert's uncontroverted testimony established that for an individual like Nunez to maintain employment, the individual could not be off task for more than 10% of the workday or absent more than one day per month. Ultimately, the ALJ concluded that Nunez had a "moderate limitation" with respect to "concentrating, persisting, or maintaining pace," Cert. Admin. R. at 26, a regulatory phrase for the ability "to focus attention on work and to stay on-task at a sustained rate." 20 C.F.R. § 404, subpt. P, app'x 1. The phrase also encompasses the ability to maintain "regular attendance at work[,] and work[] a full day without needing more than the allotted number or length of rest periods during the day." *Id.* Yet, the ALJ's RFC determination did not reflect any limitations regarding Nunez's inability to sustain an ordinary work routine. Moreover, the medical opinions in the record—including all the evidence that the ALJ found persuasive—were unanimous that Nunez had some degree of limitation in his abilities to stay on task and maintain regular work attendance.

On this record, we hold that the ALJ's RFC determination was not supported by substantial evidence. Accordingly, we **VACATE** the district court's judgment with instructions to **REMAND** the matter to the Commissioner for further development of the record and reconsideration of Nunez's application.

Judge Sullivan dissents in a separate opinion.

_____

JOHN J. MORAN (Daniel S. Jones, *on the brief*), Binder & Binder, New York, NY, *for Plaintiff-Appellant*.

ELIZABETH J. KIM (Christopher Connolly, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendant-Appellee*.

_____

EUNICE C. LEE, *Circuit Judge*:

Plaintiff-Appellant Govanni R. Nunez appeals from a judgment entered in the United States District Court for the Southern District of New York (Valerie Figueredo, *Magistrate Judge*), granting a motion for judgment on the pleadings in favor of Defendant-Appellee Commissioner of Social Security (the "Commissioner"). Upon review, we hold that the Administrative Law Judge ("ALJ") did not support her opinion regarding Nunez's residual functional capacity ("RFC") with substantial evidence.

During the administrative hearing, the vocational expert's uncontroverted testimony established that for an individual like Nunez to maintain employment, the individual could not be off task for more than 10% of the workday or absent more than one day per month. Ultimately, the ALJ concluded that Nunez had a "moderate limitation" with respect to "concentrating, persisting, or maintaining pace," Cert. Admin. R. at 26, which is a regulatory phrase defined as the ability "to focus attention on work and to stay on-task at a sustained rate." 20 C.F.R. § 404, subpt. P, app'x 1. It encompasses the ability to maintain "regular attendance at work[,] and work[] a full day without needing more than the allotted number or length of rest periods during the day." *Id.* Yet, the ALJ's RFC determination did

3

not include any limitations reflecting Nunez's ability to sustain an ordinary work routine. Moreover, the medical opinions in the record—including all the evidence that the ALJ found persuasive—were unanimous that Nunez had some degree of limitation in his abilities to stay on task and maintain regular work attendance.

On this record, we hold that the ALJ's RFC determination was not supported by substantial evidence. Accordingly, we **VACATE** the district court's judgment and instruct that the matter be **REMANDED** to the Commissioner for further development of the record and reconsideration of Nunez's application.

Judge Sullivan dissents in a separate opinion.

### BACKGROUND[1]

Prior to the onset of Nunez's medical symptoms, he worked full time as a security guard for the New York Public Library. His education was limited, as he had attended school in special education classes through the fifth grade, after which he dropped out due to instability at home. As a security guard, Nunez oversaw the library's Fifth Avenue entrance, where he checked individuals entering and exiting the library for weapons and other contraband.

---

[1] We describe the facts as established in the administrative record. They are largely undisputed.

In 2013, at the age of 35, Nunez had his first panic attack while riding the subway to work. Since then, Nunez has suffered from panic symptoms when in enclosed spaces, especially when riding the subway. His panic attacks generally last 5 to 20 minutes and cause tachycardia (irregular, rapid heart rate), palpitations, cold sweats, nausea, shortness of breath, and tingling in his extremities. Nunez has been treated for anxiety and panic attacks since at least November 2016. He was initially prescribed Lexapro,[2] to which he responded well, and he was symptom free for approximately one year. However, after tapering off Lexapro, his symptoms reemerged in June 2018.

Although he had resumed taking Lexapro by August 2018, Nunez's panic attacks sometimes required him to leave his security post during work hours. Moreover, because his anxiety medications made him drowsy, Nunez began falling asleep during his shifts. On August 22, 2018, the library terminated his employment, advising him that he was having "too [many] panic attacks on the job." Cert. Admin. R. at 51.

Nunez filed for both Supplemental Security Income and Social Security

---

[2] Lexapro is the brand name of escitalopram, a medication used to treat depression and anxiety. *See Lexapro (escitalopram): Anxiety & Depression Treatment*, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18917-escitalopram-tablets [https://perma.cc/CM87-WWQH].

Disability Insurance on September 9, 2018, for benefits from mid-2018 to the end of 2022, per his date last insured. He asserted a disability onset date of August 22, 2018 —the date he was forced to leave his job due to his condition.[3] The Social Security Administration ("SSA") first denied his claims on December 24, 2018. Nunez appealed this denial to an ALJ.

## I.     Hearing Testimony and Evidence Before the ALJ

On August 14, 2019, ALJ Angela Banks held a hearing with Nunez, his attorney, and a vocational expert. The hearing began with Nunez's testimony. He testified about his terminated employment at the library and his ongoing symptoms. He explained that his condition had worsened over time, and that mornings had become particularly difficult for him because he usually woke up "shaking with tremors." Cert. Admin. R. at 48; *see also id.* at 49 (Nunez testifying that, so far in 2019, he had woken up "almost every day" with "tremors," a "heat" in his body and chest, and feeling like he "can't breathe"). Nunez further testified that his anxiety and panic attacks were provoked by "going out[side]," "taking the train," and "taking the bus." *Id.* at 53.

---

[3] Although Nunez's application referenced both physical and mental impairments, and the agency considered Nunez's physical impairments, its determination with respect to those conditions is not at issue on appeal. Accordingly, we limit our review and discussion to Nunez's claims of mental health conditions.

To treat his panic attacks, Nunez was prescribed a medication called Atarax,[4] which he was directed to use as an "emergency pill" when he felt a panic attack coming on. *Id.* at 50. At the time of the hearing, Nunez took Atarax three to four times a day because of the frequency of the panic attacks. As a result, he felt like his "whole life [wa]s sleeping" because the medication caused him to fall asleep 35 to 40 minutes after taking it. *Id.* at 55.

Nunez estimated that in any given week, he had two or three good days without panic attacks. Nunez "t[ook] advantage" of those times to "do [his] chores" and "what [he] ha[d] to do in order to get around." *Id.* at 53. On the days he "ha[d] the energy" for it, he would also go on walks, go to church, and visit family members. *Id.* at 56. However, his walks were generally limited to two to three blocks because he was too tired to go any further. Similarly, the church he attended was across the street from his home, and he sometimes left "in the middle of the mass because [he was] not feeling good." *Id.* When he visited family members' homes, they would pick him up by car because his panic attacks prevented him from driving himself.

---

[4] Atarax is the brand name for hydroxyzine, an antihistamine that is used to "help control anxiety and tension," and to "produce sleep before surgery." *Hydroxyzine (Oral Route)*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydroxyzine-oral-route/description/drg-20311434 [https://perma.cc/MQB7-LSDS].

After Nunez finished testifying, the hearing turned to the vocational expert's testimony. The ALJ began by asking the vocational expert to determine whether Nunez could perform his previous work as a security guard. Specifically, the ALJ posited the following hypothetical to the vocational expert:

> I'd like for you to assume an individual with the same age, education and past work as the claimant with no exertional limitations bu[t] the following non-exertional limitations. . . . He requires a setting that is goal-oriented versus requiring that he maintain a specified pace consistently throughout a work day and he can tolerate occasional interaction with the public and remains able to interact appropriately with supervisors and coworkers. With those limitations would such an individual be able to perform any of the claimant's past work?

*Id.* at 63–64. The vocational expert answered that Nunez could not perform his past work as a security guard given these limitations, but that he *could* perform other unskilled work, including as a "final assembler," "hand packager," or "assembler of products." *Id.* at 64.

The ALJ and Nunez's attorney then asked the vocational expert further hypotheticals regarding certain work-related limitations for this type of worker. In response, the vocational expert explained that an unskilled worker like Nunez could not maintain employment if he was off task for "greater than 10 percent of the work day" or if he was "unable to accept instructions and respond appropriately to criticism from supervisors up to one-third of the day." *Id.* at 65.

8

Moreover, the vocational expert explained, an individual like Nunez could not miss more than one day of work per month and still be employed:

> [Nunez's attorney]: . . . [W]hat is your opinion of the maximum amount of absences due to treatment or impairments that would permit the individual to maintain employment?
>
> [Vocational expert]: One day per month, Counselor.

*Id.* at 66. In other words, the vocational expert's uncontroverted testimony established that Nunez would not be able to maintain employment if his medical condition caused him to be off task for more than 10% of a given workday or to miss work more than one day per month.

In addition to hearing testimony, the ALJ was provided with documentary evidence and five medical opinions evaluating Nunez's mental health. The opinions were from the following sources: (1) Patrick Schulte, M.D., Nunez's treating psychiatrist, (2) L. Blackwell, Ph.D., a Disability Determination Services medical consultant, (3) Glenn Bromley, Ph.D., an SSA examining consultative psychiatrist, (4) Solomon Miskin, M.D., an examining psychiatrist, and (5) James K. Ellis, Ph.D., an examining psychologist. The documentary evidence included various tests, self-reports, and impairment questionnaires, along with Dr. Schulte's office visit notes and notes from Nunez's group therapy sessions.

## II.     The SSA's Five-Step Inquiry for Disability Determinations

For the purposes of the Social Security Act, a claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).

Before delving into the ALJ's decision regarding Nunez, we briefly explain the "five-step, sequential evaluation process" used by the SSA to determine whether a claimant is disabled.  *See Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014)).   If the agency can find that a claimant is "disabled or not disabled at a step, [the SSA] make[s] [its] determination . . . and [the SSA] do[es] not go on to the next step." 20 C.F.R. § 404.1520(a)(4)  (describing  process  for  Social  Security  Disability Insurance determinations); *id.* § 416.920(a)(4) (same for Supplemental Security Income determinations).   If a claimant is found to be "not disabled" at any step of the evaluation, the claimant will not receive benefits.

The SSA first asks whether the claimant is currently "doing substantial gainful activity."   *Id.* § 416.920(a)(4)(i).   If yes, the claimant is not disabled.   *Id.* If not, the SSA moves to step two to consider "whether the claimant has a severe

10

impairment or combination of impairments."[5]  *Estrella*, 925 F.3d at 94 (quoting

*McIntyre*, 758 F.3d at 150).  If not, the claimant is not disabled.  If yes, the SSA

moves to step three to evaluate whether the claimant's "impairment(s) . . . meets

or equals" the severity of one of the listings in the SSA's "Listing of Impairments."[6]

20 C.F.R. § 416.920(a)(4)(iii); *see* 20 C.F.R. part 404, subpart P, appendix 1.  If yes,

the claimant is disabled and eligible for benefits; if not, the SSA moves to step four.

At step four, the SSA determines whether the claimant can perform any of their

past relevant work based on an assessment of the claimant's "residual functional

capacity."[7]  *Id.* § 416.920(a)(4)(iv).  If the claimant can perform any of their past

relevant work, the claimant is not disabled.  If the claimant cannot, then at the

fifth and final step, the SSA evaluates "whether there are significant numbers of

jobs in the national economy that the claimant can perform given the claimant's

---

[5] "[T]he standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases."  *McIntyre*, 758 F.3d at 151.  So long as a disability more than minimally affects a claimant's ability to perform basic work functions, the claim will move forward.  *See* SSR 85-28, 1985 WL 56856, at *3 (1985) (the SSA clarifying, in a policy statement, what is required for a showing of severity at the second sequential step).

[6] The SSA's Listing of Impairments "describes for each of the major body systems[,] impairments . . . consider[ed] . . . severe enough to prevent an individual from doing any gainful activity."  20 C.F.R. § 404.1525(a).

[7] To determine the claimant's RFC, the ALJ must consider their "impairment(s), and any related symptoms . . . [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting."  20 C.F.R. § 416.945(a)(1).

[RFC], age, education, and work experience." *Estrella*, 925 F.3d at 94 (quoting *McIntyre*, 758 F.3d at 150). If at this stage the SSA is unable to show that other such jobs exist, the claimant is entitled to benefits; otherwise, the claimant is deemed not disabled. The claimant bears the burden of proof at steps one through four, whereas the SSA bears the burden at step five. *Id.*

### III.    The ALJ's Decision

The ALJ's November 14, 2019 decision began by determining that Nunez had acquired sufficient quarters of coverage through his earnings to remain insured through December 31, 2022, and was thus eligible for benefits. The ALJ then conducted the five-step evaluation process. At step one, the ALJ found that Nunez had not engaged in substantial gainful activity since August 22, 2018, the date he alleged his disability began. At step two, the ALJ found that Nunez had the following severe impairments (i.e., impairments that caused more than minimal functional limitations): asthma, agoraphobia with panic disorder, and generalized anxiety disorder.

Although Nunez's impairments satisfied step two, at step three the ALJ found that Nunez's conditions did not meet the severity levels set by the Listing of Impairments. To reach this conclusion, the ALJ evaluated Nunez's "four broad functional areas" (as defined by the SSA) to determine the severity of Nunez's

mental impairments.  *See* 20 C.F.R. § 404.1520a(c)(3) (identifying the "four broad functional areas" as the abilities to "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself").  The ALJ determined that Nunez had a "moderate limitation" with respect to "concentrating, persisting, or maintaining pace," explaining that:

> The claimant reported that he has impaired concentration and difficulty comp[l]eting tasks.  However, the claimant's mental status examinations indicate that he has a fair prognosis, and recent psychiatric evaluation in August 2019 showed good attention and concentration.  Nonetheless, the claimant was diagnosed with generalized anxiety behavior and various other mental disorders showing that the claimant was anxious and had panic attacks.

Cert. Admin. R. at 26 (internal citations omitted).  The SSA considers the broad functional area of "concentrating, persisting, or maintaining pace" as pertaining to the ability "to stay on-task at a sustained rate," "sustain[] . . . regular attendance at work[,] and work[] a full day without needing more than the allotted number or length of rest periods during the day."  20 C.F.R. § 404, subpt. P, app'x 1 §§ 12.04(B), 12.06(B).

The ALJ then turned to step four, analyzing each of the medical opinions in the record to determine Nunez's mental RFC.  Of the five opinions pertaining to Nunez's mental health, the ALJ evaluated four for persuasiveness: the opinions of

13

Dr. Schulte, Dr. Blackwell, Dr. Bromley, and Dr. Ellis.[8]   According to the SSA's impairment questionnaire, a finding of "moderate limitations" suggests that Nunez's ailments interfere with his work up to one-third of an 8-hour workday. All four medical opinions found Nunez to have at least moderate limitations with respect to his ability to sustain an ordinary routine, maintain concentration, and maintain regular attendance at work or perform activities within a schedule.

Nonetheless, the ALJ found all four medical opinions to be unpersuasive, except for a *portion* of the opinion of the SSA consultative psychiatrist, Dr. Bromley. *See* Cert. Admin. R. at 29–31 (rejecting the Blackwell, Schulte, and Ellis opinions as "not persuasive").   Specifically, as to Nunez's ability to sustain an ordinary routine and regular attendance, and maintain concentration, the ALJ explained that Dr. Bromley's "finding of mild to moderate limitations" was "persuasive" because it was "consistent with [Nunez's] ongoing mental health diagnosis, including mental status examination showing persisting anxiety and panic attacks."   *Id.* at 30.   However, she rejected Dr. Bromley's finding of marked

_____

[8] The portion of the ALJ's opinion that explained how she considered and weighed each medical opinion did not include an explanation of its disregard of Dr. Miskin's opinion, although it mentioned that Dr. Miskin's January 2019 psychiatric evaluation "revealed that the claimant had ongoing panic attacks with agoraphobia and anxiety."   Cert. Admin. R. at 29.   Following that January 2019 examination, Dr. Miskin concluded that based on Nunez's "history, mental status examination and records reviewed," Nunez "is permanently disabled."   *Id*. at 736.

14

limitations regarding "understanding, remembering, and applying complex directions and instructions, regulat[ing] emotion, controlling behavior, and maintaining well-being" as "not supported and consistent" with the rest of the record. *Id.*

Based on her review of the medical opinions, the ALJ determined that Nunez had the following mental RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: . . . . The claimant remains able to perform the demands of work that requires him to understand, remember, and carry out instructions consistent with occupations that can be learned in up to 30 days. *The claimant requires a setting that is goal-oriented versus requiring that he maintain a specific pace consistent throughout the day.* He can tolerate occasional interaction with the public, and remains able to interact appropriately with supervisors and co-workers.

*Id.* at 27 (emphasis added). Although the ALJ credited Dr. Bromley's finding that Nunez had "mild to moderate limitations . . . sustaining concentration and performing tasks, [and] sustaining ordinary routine and regular attendance," *id.* at 30, the ALJ's RFC determination's only mention of Nunez's ability to stay on task is an implicit one: that "he requires a setting that is goal-oriented." *Id.* at 27. The RFC did not mention any of Nunez's limitations regarding his ability to maintain regular work attendance or stay on task, or how that limitation could be

15

addressed in the workplace.

"Based on the testimony of the vocational expert," the ALJ concluded at step four that Nunez's past work as a security guard exceeded the bounds of his mental RFC, but the ALJ nonetheless found at step five that Nunez was not disabled.   *Id.* at 31–32.   Specifically, the ALJ pointed to the vocational expert's conclusion that, given Nunez's "age, education, work experience, and [RFC]," he could make "a successful adjustment to other work that exists in significant numbers in the national economy," including as a final assembler, packager, and product assembler.   *Id.* at 32.

\*       \*       \*

Nunez appealed the ALJ's decision to the Appeals Council, which denied his request for review on January 14, 2021, rendering the ALJ's determination final. On March 17, 2021, Nunez initiated the underlying federal action, seeking review of the SSA's determination.   On March 30, 2023, Magistrate Judge Figueredo affirmed the SSA's denial of benefits.   Nunez's appeal is now before us.

**STANDARD OF REVIEW**

"On an appeal from the denial of disability benefits, we focus on the administrative ruling rather than the district court's opinion."   *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (quoting *Estrella*, 925 F.3d at 95).   We review the

16

administrative record anew, "to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Id.* (quoting *Estrella*, 925 F.3d at 95); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) ("In determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam))).

"Substantial evidence" is "a very deferential standard of review." *Schillo*, 31 F.4th at 74 (quoting *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012)). Indeed, under the substantial evidence standard, the SSA's determination must be upheld if it is rational and supported by the record, even "[i]f [the] evidence is susceptible to more than one rational interpretation." *Id.* (quoting *McIntyre*, 758 F.3d at 149); *see also Brault*, 683 F.3d at 448 ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise." (internal quotation marks and emphasis omitted)). Nevertheless, even under this deferential standard, the ALJ must still set forth the "crucial factors" underlying their factual findings and determinations with "*sufficient specificity*" so that the reviewing court

17

can "decide whether the determination is supported by substantial evidence."

*Schillo*, 31 F.4th at 74 (emphasis added) (quoting *Estrella*, 925 F.3d at 95).

## DISCUSSION

On appeal, Nunez argues that the ALJ failed to support the determination of his mental RFC with substantial evidence. We agree. The vocational expert testified that an individual like Nunez could not be off task for more than 10% of a given workday or be absent more than one day per month and still maintain employment. Yet, in the RFC determination, the ALJ did not specify any limitations reflecting Nunez's reduced ability to stay on task or attend work regularly. Nor did she provide any reason for or evidence to support her implicit determination that he lacked these limitations. We have reviewed the ALJ's decision and conducted a plenary review of the administrative record, and we are unable to find any support for her implicit conclusion, at step four, that Nunez can: (1) be on task for at least 90% of a given workday, and (2) attend work regularly, missing no more than one day of work per month, as required to support employment and a finding of non-disability. This absence of support and explanation requires vacatur and remand.

### A. Nunez's Likely Attendance Issues and Predicted Time Off Task

We first consider the ALJ's implicit conclusion at step four that Nunez's only

limitation with respect to sustaining an ordinary work routine is that he "requires a setting that is goal-oriented" rather than requiring a "specific pace consistent throughout the workday." Cert. Admin. R. at 27. This determination fails to account for the ALJ's parallel explicit finding that Nunez has a "moderate limitation" with respect to "concentrating, persisting, or maintaining pace." *Id.* at 26. By definition, those characteristics include Nunez's ability "to focus attention on work and to stay on-task at a sustained rate," including by attending work regularly and "working a full day without needing more than the allotted number or length of rest periods during the day." 20 C.F.R. § 404, subpt. P, app'x 1. Further, the ALJ's determination of a workday limitation only as to pace-oriented work fails to account for the portion of Dr. Bromley's medical opinion that the ALJ credited—the assessment that Nunez is "moderately limited in his ability to sustain an ordinary routine and regular attendance at work." Cert. Admin. R. at 331; *see id.* at 30 (ALJ concluding that "Dr. Bromley's finding of mild to moderate limitations is persuasive").

Neither the ALJ nor Dr. Bromley explained what they meant by "moderate" limitations in Nunez's ability to sustain an ordinary work routine. In the SSA's impairment questionnaire, "moderate limitations" are defined as symptoms that cause interference "up to 1/3 of an 8-hr workday." Cert. Admin. R. at 399.

"Moderate-to-marked limitations" are defined as symptoms that cause interference from "1/3 [to] 2/3 of an 8-hr workday." *Id.* The record does not indicate whether Dr. Bromley had these definitions in mind when concluding that Nunez was moderately limited in his ability to "sustain . . . regular attendance at work," *id.* at 331, nor whether the ALJ considered these definitions in finding "persuasive" Dr. Bromley's assessment that Nunez had "mild to moderate limitations … [in] sustaining ordinary routine and regular attendance," *id.* at 30.

However, if Dr. Bromley and the ALJ did have the SSA definitions in mind, this would strongly suggest that Nunez is disabled, given the vocational expert's testimony that he could not be off task more than 10% of the workday or miss more than one day per month and still maintain employment in an unskilled position. The discrepancy between the ALJ's RFC determination, on the one hand, and Dr. Bromley's opinion and the ALJ's express findings regarding Nunez's moderate limitations, on the other, compels our decision to remand for further clarification and record development on this point. *See Mongeur*, 722 F.2d at 1040 ("[W]e . . . remand for further findings or a clearer explanation where we [can]not fathom the ALJ's rationale in relation to evidence in the record." (internal quotation marks omitted)).

Even if an ALJ's reasoning is opaque, we typically do not remand if "the evidence of record permits us to glean the rationale of an ALJ's decision." *Id.* But here, we have reviewed the entirety of the ALJ's decision and the administrative record and cannot find *any* justification for the ALJ's RFC determination, particularly with respect to its implicit conclusion that Nunez would not be off task more than 10% of the workday or miss more than one day of work per month. Dr. Bromley's opinion—the only medical opinion that the ALJ found persuasive—contains a single unexplained reference to Nunez's limitations in this area. He wrote that Nunez is "moderately limited in his ability to sustain an ordinary routine and regular attendance at work." Cert. Admin. R. at 331. But he provides no indication of how many days Nunez may be absent from work each month or how many hours off task each day during work hours. Cert. Admin. R. at 331. Turning to the rest of the record, Dr. Blackwell's opinion is also silent regarding the number of days Nunez would likely be absent. The two remaining medical opinions—the only ones to specifically address the likelihood of absence from work—both conclude that Nunez would likely miss two or more days of work per month. Although "[n]othing in the regulation indicates that an ALJ's ultimate determination . . . of RFC must comport with a specific medical opinion," the lack of a medical opinion that supports the ALJ's

21

conclusion is "not insignificant." *Rubin v. O'Malley*, 116 F.4th 145, 155–56 (2d Cir.

2024). The lack of support, here, is significant.

To illustrate, below is a chart of each opinion's conclusions regarding

Nunez's ability to sustain an ordinary work routine:[9]

| Provider | Date | Opinion |
|----------|------|---------|
| Dr. Bromley | 11/14/18 | Nunez is "mildly limited in his ability to . . . sustain concentration and perform a task at a consistent pace; [and] moderately limited in his ability to sustain an ordinary routine and regular attendance at work." Cert. Admin. R. at 331. |
| Dr. Blackwell | 12/20/18 | Nunez is moderately limited in his ability to "use public transportation," "to maintain attention and concentration for extended periods," and "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." *Id.* at 96–97. |
| Dr. Schulte | 1/2/19; 6/9/19 | Nunez is moderately limited in his ability to "[m]aintain attention and concentration for extended periods" and "[p]erform at a consistent pace without rest periods of unreasonable length or frequency," and moderately-to-markedly limited in his ability to "use public transportation." *Id.* at 399-400 (January 2019 assessment); *id.* at 719 (June 2019 assessment). In January 2019, Dr. Schulte noted that Nunez will miss work "[m]ore than three times per month." *Id.* at 400. In June 2019, Dr. Schulte noted that Nunez will miss work "[t]wo to three times per month." *Id.* at 720. |

---

[9] As noted *supra* note 8, the ALJ did not include Dr. Miskin's medical opinion in her own analysis. That lapse may have contravened 20 C.F.R. § 404.1520c(b), but Nunez does not raise that argument before us, and so we do not consider Dr. Miskin's views here.

| Dr. Ellis | 8/5/19 | Nunez is markedly limited in his ability to "[m]aintain attention and concentration for extended periods," "[p]erform activities within a schedule and consistently be punctual," "[s]ustain ordinary routine without supervision," "[c]omplete a workday without interruptions from psychological symptoms," "[p]erform at a consistent pace without rest periods of unreasonable length or frequency," and "use public transportation." *Id.* at 727. He will miss work "[m]ore than three times per month." *Id.* at 728. |
|---|---|---|

As evidenced, the medical opinions in the record consistently concluded that Nunez had at least moderate limitations in his ability to maintain a regular work routine and, to the extent that they opined on the issue, also concluded that he would miss at least two days of work per month. Thus, there is no substantial evidence in the record to support the ALJ's implicit conclusions that Nunez (1) will miss, at most, one day of work per month and (2) will remain on task during 90% of a given workday, such that a suitable job in the national economy exists.

The error in determining Nunez's RFC at step four infected the final determination of his disability status. At step five, it is the Commissioner's burden to establish that "there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *McIntyre*, 758 F.3d at 150. Here, the medical opinions, and Nunez's testimony, indicated that Nunez had at least

moderate limitations in his ability to maintain a regular work schedule. At the ALJ hearing, the vocational expert testified that an unskilled worker, such as Nunez, cannot be employed if he misses more than one day of work per month. The ALJ nonetheless made an RFC determination that failed to address Nunez's ability to attend work and stay on task. In light of this failure, the record contained insufficient material to permit the government to carry its burden of demonstrating that jobs in the national economy, suitable for Nunez given his RFC, exist. The failure to account for Nunez's likelihood of absences and unproductive time, particularly considering the largely unrebutted evidence that Nunez will be absent from work and off task to an extent that the vocational expert testified is disabling, warrants remand. *See Lesterhuis v. Colvin*, 805 F.3d 83, 88 (2d Cir. 2015) (per curiam) (remanding to the SSA because the record "does not include any contrary 'substantial evidence' that would support the ALJ's conclusion regarding disability based on the number of workdays that [the claimant] would miss per month").

## B. The Persuasiveness of the Medical Opinions

On this record, some aspects of the ALJ's evaluation of the medical opinions evidence are not supported by substantial evidence. Here, despite support from medical records and treatment notes, the ALJ found all the medical opinions in the

24

record, except for one portion of Dr. Bromley's, unpersuasive. Under the SSA, the ALJ must determine whether to credit or reject a particular medical opinion by evaluating two main factors: (1) "supportability," i.e., how well the objective medical evidence and explanations given support the medical source's conclusions; and (2) "consistency," i.e., how consistent the opinion is with the rest of the record.[10] 20 C.F.R. § 404.1520c(a), (c)(1)–(2); *see also Rubin*, 116 F.4th at 148 (explaining that "supportability and consistency are the most important" factors in evaluating persuasiveness of a medical opinion). There must be an explicit explanation of how the ALJ considered supportability and consistency for *each* "medical source's medical opinions or prior administrative medical findings." 20 C.F.R. § 404.1520c(b)(2).[11]

---

[10] For claims filed prior to March 27, 2017, the SSA applied the "treating physician rule," which required "the ALJ to treat the opinions of treating physicians as controlling, 'so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022) (alteration in original) (quoting *Estrella*, 925 F.3d at 95). For cases filed after March 27, 2017, like Nunez's, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Cases discussing the persuasiveness of a physician's medical opinion under that rule nevertheless seem to us relevant to the persuasiveness determination here.

[11] In contrast, an ALJ "may, but [is] not required to" provide an explicit explanation of other factors when choosing whether to credit or reject a medical opinion. 20 C.F.R. § 404.1520c(b)(2).

The present record does not contain substantial evidence to support a rejection of all the medical opinions for lack of consistency. The ALJ evaluated four of the five medical opinions concerning Nunez's mental health for persuasiveness, rejecting three of them in whole on her finding that they were "not persuasive," and one of them in part. Cert. Admin. R. at 30–31. In her analysis, the ALJ rested each of her persuasiveness determinations at least in part on her conclusion that the rejected findings were not consistent with the totality of the medical record. However, because each rejected opinion was largely consistent with the others, the record does not provide substantial evidence to support the ALJ's rejection of them all for lack of consistency. *See Rubin*, 116 F.4th at 156 (acknowledging that the ALJ does not need to find any single medical opinion persuasive but finding still that the "ALJ erred because she misinterpreted the medical and lay evidence, failing to appreciate the consistent narrative that it provides"). Moreover, the medical opinions are also consistent with Nunez's own testimony of anxiety symptoms and Dr. Schulte's extensive treatment notes that document, *inter alia*, recurring morning panic attacks and shortness of breath on public transportation. *See* 20 C.F.R. § 404.1520c(c)(2) (explaining that a medical opinion is "more persuasive" if consistent "with the evidence from other medical sources and nonmedical sources in the claim").

We also find no substantial evidence in the record to substantiate the ALJ's determination that Dr. Schulte's opinion was "not supported." Cert. Admin. R. at 30. The ALJ rejected Dr. Schulte's medical opinion, which concluded that Nunez will "miss three workdays per month," and that he has "moderate limitations . . . completing a workday, [and] performing tasks at a consistent pace," because it was "not supported [by] and consistent with Dr. Schulte's mental status examination of the claimant." *Id.* The ALJ justified her rejection of Dr. Schulte's opinion based on what she saw as a contradiction between Dr. Schulte's conclusions and his observations in mental status examinations. She stated she thought that the doctor's "objective mental status examinations" indicated that "the claimant was mentally stable" because he "showed normal speech, intact memory, [and] calculation skills," yet he still "opined that claimant is unable to work." *Id.* at 30. But there is no discrepancy between the cited examination findings and the doctor's opinion.

The mental status examinations note sporadic improvements in Nunez's chronic anxiety due to continued treatment, but do not substantiate the ALJ's assertion that Nunez is "mentally stable." *Id.* Instead, the treatment notes from Dr. Schulte's near-weekly appointments with Nunez in 2018 and 2019, comprising the bulk of the administrative record, corroborate that Nunez suffers from chronic

anxiety,[12] and his occasional improvements—cited favorably by the ALJ—are intermittent. At times, he is subject to regression. *See Estrella*, 925 F.3d at 97 (holding that the "cyclical nature of [the applicant's mental health issues]" cautions against "minimalizing [a medical opinion]" on the basis of sporadic improvement). For instance, Dr. Schulte's notes detail Nunez's "[shortness of breath and] tachycardia when in [the subway station]" and observe that Nunez "fears recurrence of panic attacks when traveling throughout the day, being alone . . . [and experiences a] catastrophic thought process that he may be brought to the hospital and admitted," even during periods when his symptoms overall were "more manageable." Cert. Admin. R. at 421–22. During one period of "improvement," Dr. Schulte's notes describe Nunez missing an appointment because of a resurgence of anxiety. He also observed Nunez's inability to

_____

[12] As noted *supra* note 9, because the treating physician rule does not apply, the ALJ was not required to give any controlling weight to Dr. Schulte's medical opinion. However, Dr. Schulte's opinion is independently supported by his extensive treatment notes and examinations, and is consistent with the four other medical opinions. Further, the SSA explicitly identifies a medical source's relationship with the claimant as one of the factors that will be considered in evaluating the persuasiveness of the medical source's opinion. *See* 20 C.F.R. § 404.1520c(c)(3) (listing "[r]elationship with claimant" as one of the explicit factors the agency considers in evaluating a medical opinion); *id.* § 404.1520c(c) (noting that the agency "will consider" the treating relationship even if only required to articulate the supportability and consistency factors). Here, Dr. Schulte is the medical source with the longest and most extensive treating relationship with Nunez, including the most frequent examinations, permitting a longitudinal assessment of his mental health impairments.

complete Dr. Schulte's treatment assignments, such as practicing his commute to work by train. *See, e.g.*, Cert. Admin. R. at 657 ("Patient reports worsening of anxiety in context of not completing [homework] assignments regarding taking the 4 train."). In cases involving mental health conditions, we regularly caution against rejecting medical opinions when they reflect the type of cyclical changes apparent from this record. *E.g., Estrella*, 925 F.3d at 97.

The ALJ also found that Dr. Schulte's opinion lacked support in part because it was based on Nunez's "own self-reported statements to Dr. Schulte." Cert. Admin. R. at 30. But well-established case law cautions against reflexively rejecting subjective reports in mental health cases because mental health diagnoses necessarily rely on self-reported statements. *See Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022) (noting that "[p]sychiatric testing is inherently based on subjective reports"); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (explaining that a medical opinion's reliance on the claimant's "subjective complaints hardly undermines [the] opinion . . . as a patient's report of complaints, or history, is an essential diagnostic tool" (internal quotation marks omitted)). The ALJ's approach on this issue was erroneous.

### C.    Nunez's Testimony

The ALJ also discounted testimony of Nunez that was itself consistent with

the opinions of his physicians. Although an ALJ "is not required to accept the claimant's subjective complaints without question" and may instead "exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record," *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010), an ALJ's credibility determination still must be supported by substantial evidence and "set forth with sufficient specificity to permit intelligible plenary review of the record," *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988). Here, the ALJ rejected Nunez's testimony—and discredited Nunez's self-reports to Dr. Schulte—largely, on our reading, because Nunez "admitted that his medications 'help' his condition and [that] he can shop in store and use public transportation." Cert. Admin. R. at 28 (citing Exhibits 3E and 4F). The record does not support the rejection of his testimony on this basis, however. The ALJ's justification was contradicted by the portions of the record that it cited and reflected unjustifiable cherry-picking among Nunez's statements.

First, Exhibits 3E and 4F do not support the ALJ's assertion that Nunez is regularly able to take public transportation. In Exhibit 3E, a physical function report completed by him on September 22, 2018, Nunez states that although he can use public transportation, he suffers panic attacks on the bus and needs to ask the driver to let him off early. Similarly, in Exhibit 4F, a medical examination

30

conducted on November 14, 2018, Dr. Bromley states that Nunez "does not drive because of panic, and he cannot take public transportation by himself." Cert. Admin. R. at 331. This record evidence further supports Nunez's asserted limitations.[13]

Second, the ALJ's reliance on Nunez's ability to grocery shop and use public transportation intermittently does not provide substantial evidence supporting the ALJ's decision to discredit Nunez's testimony regarding his disabilities. Under our case law, "a claimant need not be an invalid to be found disabled under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1988) (internal quotation marks omitted) (superseded in part by regulation); *see Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022) (noting that claimant's "ability to engage in certain activities of daily living" did not provide substantial record evidence to discount a physician's medical opinion). Nunez's statement that in each week, he has two or three "good days," on which he "take[s] advantage" of the time to do "what [he] ha[s] to do in order to get around" does not discredit his testimony—nor Dr. Schulte's medical opinion—concerning his disability. Cert. Admin. R. at 53. Indeed, it supports both that testimony and Dr. Schulte's medical opinion as to his

_____

[13] It also casts doubt on the finding implicit in the ALJ's RFC determination that Nunez would be able to attend work without frequent absences.

31

ability to attend work. A person who has two or three "good days" when he can leave the house is likely to miss work on the remaining "bad days" of the week.

In light of substantiated and consistent record evidence, including Nunez's testimony and self-reports, the record does not contain substantial evidence to support the ALJ's rejection of various medical opinions for lack of supportability and consistency. The principle that we do not remand if an independent review of the record reveals appropriate evidentiary support for an ALJ's determinations "presupposes that the ALJ has not disregarded or misconstrued relevant evidence and has not applied incorrect legal standards." *Rubin*, 116 F.4th at 155. Because such presuppositions have not been satisfied in this instance with respect to the medical opinion evidence, we remand to the ALJ for "fuller consideration" consistent with the applicable legal standards and regulations. *See id.* at 161.

\* \* \*

For the reasons set forth above, we remand this case to the ALJ for further record development and re-evaluation of the medical opinions to fully determine: (1) Nunez's RFC at step 4, including whether Nunez has the capacity to be off task for no more than 10% of the workday and to miss no more than one day of work per month; and (2) in light of the limitations on Nunez's ability to maintain regular attendance, whether, at step 5, there are jobs in the national economy that Nunez

could perform.

## CONCLUSION

The judgment of the United States District Court for the Southern District of New York is **VACATED** and the case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

This should be an easy case. Instead, the majority misapplies the appropriate standard of review and flyspecks a lengthy administrative record to overturn the decision of the administrative law judge ("ALJ") tasked with assessing Nunez's residual functional capacity ("RFC") to work in the national economy. Because the ALJ's finding about Nunez's RFC is supported by substantial evidence, I respectfully dissent.

The substantial-evidence standard is "a very deferential standard of review." *Schillo v. Kijakazi*, 31 F.4th 64, 74 (2d Cir. 2022) (internal quotation marks omitted). Though "more than a mere scintilla," substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (internal quotation marks omitted). That is why we typically only vacate and remand an ALJ's disability determination if "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted). This deference ensures that judges "[do] not substitute [their] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The record here supports the ALJ's decision to deny benefits. Indeed, it brims with evidence justifying the ALJ's finding that Nunez's symptoms generally improved with treatment, even if he had begun to re-experience panic attacks while commuting on the subway and working as a security guard. For example, Nunez consistently reported that Lexapro had helped alleviate his anxiety. *See, e.g.*, Cert. Admin. R. at 310 (reporting on July 20, 2018 that "anxiety has been well-controlled lately"); *id.* at 346 (reporting on October 25, 2018 that "anxiety was well-controlled for last 2–3 weeks until he received a text" that put him "on edge"); *id.* at 338 (reporting on November 15, 2018 that "anxiety has been 'more manageable' for last 2–3 weeks" with "no discreet panic attacks"). And notes from treating doctors showed that following a year of treatment, Nunez successfully used medication to subdue his panic attacks, "stay[ed] active," "volunteer[ed]," and even "appl[ied] to some jobs." *Id.* at 645.

Group-therapy sessions also helped. Nunez reported feeling "less anxious overall" after several meetings. *Id.* at 412. In the wake of such treatment and therapy, Nunez was able to perform other daily activities, from personal care to attending church to walking in the park. *Id.* at 56, 81; *see also Cichocki v. Astrue*, 729 F.3d 172, 175, 178 (2d Cir. 2013) (upholding RFC determination where individual

2

could perform basic tasks like "walking her dogs, going to scheduled appointments," and "cleaning her house" (internal quotation marks omitted)). And after mental-health providers equipped him with coping strategies, Nunez resumed traveling on the subway. *See* Cert. Admin. R. at 299, 421. Put simply, ample evidence supported the ALJ's conclusion that Nunez could perform several other lower-stress, unskilled jobs in the national economy, thus justifying the decision to deny him benefits.

To be sure, some record evidence suggests otherwise. *See, e.g., id.* at 309 (doctor's note describing how Nunez experienced reemergence of symptoms in June 2018). But "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve" – not us. *Veino*, 312 F.3d at 588. Our caselaw is clear that even if the record "may *also* adequately support contrary findings," an ALJ's "factual findings [still] must be given conclusive effect." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (emphasis added and internal quotation marks omitted); *see* 42 U.S.C. § 405(g) (noting that the Commissioner's factual determinations are "conclusive" when supported by substantial evidence).

This standard of review, on this record, strikes me as dispositive. It is hard to imagine that a panel of our Court would have disturbed the findings of a jury

or a judge in a bench trial on such a mixed record.  *See, e.g.*, *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 119 (2d Cir. 2021) (emphasizing that we will set aside a district court's findings for clear error "only if we are left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)).  And yet that is exactly what the majority has done here on an "even more" deferential standard of review than clear error.  *Brault*, 683 F.3d at 448; *see also Biestek*, 587 U.S. at 103 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").  Because the ALJ correctly applied the law and its decision was supported by substantial evidence, I respectfully dissent.

4